## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANGELA SKIBITCKY, | : | |
| *Plaintiff*, | : | CIVIL CASE NUMBER: |
| | : | |
| v. | : | 3:16-cv-00052-VLB |
| | : | |
| HEALTHBRIDGE MANAGEMENT, LLC, | : | September 18, 2017 |
| *Defendant*. | : | |

### MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 35]

This is an employment discrimination case filed by Plaintiff Angela Skibitcky against Defendant Healthbridge Management, LLC ("Healthbridge"). The Complaint raises both interference and retaliation claims in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* Healthbridge has moved for summary judgment on both counts, and in consideration of the arguments Skibitcky challenges only the FMLA retaliation claim. For the foregoing reasons, the Court GRANTS summary judgment in favor of Healthbridge.

### Background

The following undisputed facts, unless otherwise noted, are drawn from the parties' D. Conn. L. R. 56(a) statements. Healthbridge provides management services, including human resources expertise, to health care centers in Connecticut, Pennsylvania, Maryland, and New Jersey. [Dkt. 36 (D. Conn. L. R. 56(a)(1) Stmt.) ¶ 93; Dkt. 43-3 (D. Conn. L. R. 56(a)(2) Stmt.) ¶ 93]. 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care ("West River" or the "Center") is a provider of sub-acute and long-term care services and rehabilitative programs in Milford, Connecticut. *See* [Dkt. 36 ¶ 1; Dkt. 43-3 ¶ 1; Dkt.

1

34 (Mot. Summ. J.) at 1]. On January 5, 2009, West River's Recreation Program Director, Nathalie Mihalchick, hired Skibitcky as a part-time Recreational Therapist. [Dkt. 36 ¶ 6; Dkt. 43-3 ¶ 6; Dkt. 37-6 (Mot. Summ. J. Ex. 6, Mihalchick Aff.) ¶ 3]. Skibitcky reported directly to Mihalchick, who reported to the Administrator of the Center, Joanne Wallak. [Dkt. 36 ¶ 9; Dkt. 43-3 ¶ 9; Dkt. 36-1 (Mot. Summ. J. Ex. 1, Wallak Aff.) ¶ 2]. Wallak held the highest position at West River. [Dkt. 36 ¶ 9; Dkt. 43-3 ¶ 9]. West River kept Skibitcky's employment records and her W-2s from 2009 through 2014 and indicate "245 Orange Avenue Operating Company" is her employer, which she understood to be West River. [Dkt. 36 ¶¶ 98, 100; Dkt. 43-3 ¶¶ 98, 100].

West River has a Code of Conduct, which requires its employees to maintain accurate records. [Dkt. 36 ¶ 3; Dkt. 43-3 ¶ 3]. The Code of Conduct specifically requires staff "to help maintain the Center's integrity by ensuring that all records and documents, particularly those at issue in governmental investigations and inquiries are thorough, complete and accurate and that they are never altered, edited or amended except as may be permitted in strict accordance with applicable Center policies." [Dkt. 36 ¶ 3; Dkt. 43-3 ¶ 3]. The Code of Conduct also states that "[d]isregard for this principle will be grounds for serious disciplinary action up to and including termination." [Dkt. 36 ¶ 3; Dkt. 43-3 ¶ 3]. Reliability of the claims is essential because the Center's ability to get paid depends on the "thoroughness, accuracy and integrity of the medical, financial or other documentation." [Dkt. 36 ¶ 4; Dkt. 43-3 ¶ 4]. The Center requires staff to "know or reasonably believe" the information in claims and reports are "thorough, accurate, and correct." [Dkt. 36 ¶

2

4; Dkt. 43-3 ¶ 4].  West River also maintains an Equal Opportunity policy, enabling employees to contact a telephone number when they believe they are unfairly treated.  [Dkt. 36 ¶ 5; Dkt. 43-3 ¶ 5].

Skibitcky's duties as a Recreational Therapist included organizing and leading recreational activities for residents and patients.  [Dkt. 36 ¶ 13; Dkt. 43-3 ¶ 13].  Her responsibilities included the following found in her Job Description: (1) "Perform administrative requirements, such as completing necessary forms, reports, etc., and submitting such to the Activity Director as required"; (2) "Ensure that all charted activity progress notes are informative and descriptive of the services provided and of the resident's response to the service."  [Dkt. 36 ¶ 15; Dkt. 43-3 ¶ 15].  Skibitcky understood the importance of accuracy in her documentation for both West River and regulatory purposes.  [Dkt. 36 ¶ 16; Dkt. 43-3 ¶ 16].

Around March or April of 2013, Skibitcky was tasked with "implementing and spearheading the men's group, building its attendance and providing a focus oriented program."  [Dkt. 36 ¶ 17; Dkt. 43-3 ¶ 17].  She failed to timely complete invitations and communicate the agenda, and as a result she received a Documented Verbal Notice on June 3, 2013.  [Dkt. 36 ¶¶ 18-19; Dkt. 43-3 ¶¶ 18-19].  The Notice stated in bold italics, "Further problems of any kind may lead to further disciplinary action up to and including termination of employment."  [Dkt. 37-8 (Mot. Summ. J. Ex. 8, 6/3/13 Notice)].  In August 2013, Skibitcky expressed her lack of confidence in leading the men's group to Wallak and Director of Nursing Staff, Dwayne Silva, and thereafter she received an "Education" on how to successfully lead the men's group.  [Dkt. 36 ¶¶ 20-21; Dkt. 43-3 ¶¶ 20-21].

Mihalchick disciplined Skibitcky for insubordination that same month. [Dkt. 36 ¶ 22; Dkt. 43-3 ¶ 22]. The reason for this second disciplinary action was because Mihalchick scheduled Skibitcky to work on a Sunday due to an employment shortage, and in response to Mihalchick telling Skibitcky, "[W]e all have to help out and I am helping out too," Skibitcky said, "You worked one Sunday." [Dkt. 36 ¶¶ 22-24; Dkt. 43-3 ¶¶ 22-24; Dkt. 37-2 (Mot. Summ. J. Ex. 2, Pl. Dep.) at 139:14-140:8]. Skibitcky testified that, after one of the meetings she had with Mihalchick and Grabell, Grabell told her, "I would go on FLMA, if I were you, before you lose your job." [Dkt. 37-2 at 123:3-24].

Also in August 2013, Skibitcky had two physicians complete FMLA certifications for her in August 2013. Dr. Eric Liben, Skibitcky's primary care physician, indicated Skibitcky had "relatively well controlled" high blood pressure but that it could flare up if she became stressed at work and in these circumstances she should be able to leave work. [Dkt. 36 ¶¶ 34-37; Dkt. 43-3 ¶¶ 34-37]. Dr. Enrique Tello, Skibitcky's psychiatrist, opined she experienced "anxiety, episodic increases, which limit [her] ability to work," and that she may experience flare ups twice a month requiring her to be out of work for one day. [Dkt. 36 ¶¶ 38-40; Dkt. 43-3 ¶¶ 38-40]. Skibitcky thereafter submitted the certifications to Human Resources Employee, Debbie Grabell. [Dkt. 36 ¶ 40; Dkt. 43-3 ¶ 40].

On October 15, 2013, Skibitcky spoke with Grabell about taking intermittent FMLA leave for a four to six week psychiatric therapy program. [Dkt. 36 ¶ 43; Dkt. 43-3 ¶ 43]. Grabell documented this meeting in an email sent to Healthbridge's Regional Human Resources Director, Edmund Remillard, wherein she stated

4

Skibitcky complained Mihalchick was the "trigger" for her high blood pressure. [Dkt. 36 ¶ 44; Dkt. 43-3 ¶ 44]. West River approved this request. [Dkt. 36 ¶ 45; Dkt. 43-3 ¶ 45]. Skibitcky began the program on October 21, 2013, and finished the program on December 5, 2013. [Dkt. 36 ¶¶ 45-46; Dkt. 43-3 ¶¶ 45-46]. West River accommodated Skibitcky by changing her schedule so that it did not conflict with the program's schedule. See [Dkt. 36 ¶ 47; Dkt. 43-3 ¶ 47]. Skibitcky returned to her prior schedule upon completing the program. [Dkt. 36 ¶ 48; Dkt. 43-3 ¶ 48].

On December 31, 2013, Skibitcky had an argument in the recreation room with another employee, P.J., over a topic Skibitcky does not remember. [Dkt. 36 ¶¶ 50-51; Dkt. 43-3 ¶¶ 50-51]. Skibitcky admits to raising her voice. [Dkt. 36 ¶ 51; Dkt. 43-3 ¶ 51]. Both Skibitcky and P.J. were suspended pending the investigation. [Dkt. 36 ¶ 53; Dkt. 43-3 ¶ 53]. Wallak asked Skibitcky to write a statement about this event, but she did not do so. [Dkt. 36 ¶¶ 54-55; Dkt. 43-3 ¶¶ 54-55].

On January 10, 2014, Skibitcky went to a meeting with Wallak, Mihalchick, and a coworker who was there to support her. [Dkt. 36 ¶ 56; Dkt. 43-3 ¶ 56]. During the meeting Skibitcky complained that P.J. had called her a liar and that "Bob" and "Natalie" had heard this. [Dkt. 36 ¶ 57; Dkt. 43-3 ¶ 57]. Wallak informed her these individuals reported that they did not hear P.J. call her a liar or point at her, and she responded then they did not hear it. [Dkt. 36 ¶ 57; Dkt. 43-3 ¶ 57]. They reviewed her unpaid suspension and Wallak informed her "that another incident with anything or anyone else could lead to termination." [Dkt. 36 ¶ 57; Dkt. 43-3 ¶ 57]. Wallak reviewed with Skibitcky a Notice of Disciplinary Action about this event, which included the following language: "Further problems of any kind may lead to

further disciplinary action up to and including termination of employment." [Dkt. 37-15 (Mot. Summ. J. Ex. 15, 1/10/14 Notice)]. Both Wallak and Skibitcky signed the Notice. *Id.* The Notice indicates that the disciplinary action was to constitute a Final Warning. *Id.*

On or about March 18, 2014, Mihalchick visited a resident who asked for her to provide a person to read to him. [Dkt. 36 ¶¶ 62-63; Dkt. 43-3 ¶¶ 62-63]. Skibitcky's duties including reading to this resident and she completed an Activities Attendance One to One Program report representing that she read to him the day before, but the resident insisted, "I am absolutely positive I was not read to yesterday." [Dkt. 36 ¶ 65; Dkt. 43-3 ¶ 65]. He declared Skibitcky "reads to me 'when she feels like it.'" [Dkt. 36 ¶ 65; Dkt. 43-3 ¶ 65].

Mihalchick then reviewed other Activities Attendance reports for that month and discovered Skibitcky filed a report claiming she met with five patients who had in fact already been discharged. [Dkt. 36 ¶ 68; Dkt. 43-3 ¶ 68]. Mihalchick reported this information to Wallak, and they met with Skibitcky the same day. [Dkt. 36 ¶¶ 71-72; Dkt. 43-3 ¶¶ 71-72]. During the meeting, they discussed this issue as well as the resident's complaint about her not reading to him. [Dkt. 36 ¶ 73; Dkt. 43-3 ¶ 73]. With respect to the discharged patients, Wallak noted that "Angela became very nervous." [Dkt. 36 ¶ 73; Dkt. 43-3 ¶ 73]. Skibitcky later testified that the information in Wallak's notes was correct except that Wallak only discussed three discharged patients. [Dkt. 36 ¶ 74; Dkt. 43-3 ¶ 74]. Skibitkcy was immediately suspended pending investigation. [Dkt. 36 ¶ 75; Dkt. 43-3 ¶ 75].

Upon Wallak's request, Skibitcky faxed a response about the incident on March 24, 2014. [Dkt. 37-22 (Mot. Summ. J. Ex. 22, Skibitcky Fax)]. She stated,

> On tues, March 18, 2014, I was accused of "falsifying reports". [sic] Knowing my character, you would know that I would never purposely falsify any document. I do not personally know every patient and having to look on the door to see their name. While doing my visits first opportunity in the morning, I made contact with each patient in a room that I noted. I was told that one woman was with her aide and found out when I returned days later that she had been in the hospital. I also overheard another woman I had visited with tell a fellow patient that she was being discharged. Ironically the patients I had supposedly not visited were all in one hallway. I wondered what time they were discharged and if the names on the door were accurate. I apologize greatly for any inconvenience this may have caused.

[Dkt. 36 ¶ 77; Dkt. 43-3 ¶ 77]. Wallak determined that the response did not address all that was discussed and then called Skibitcky twice, leaving voicemails. [Dkt. 36 ¶ 80; Dkt. 43-3 ¶ 80]. Skibitcky did not call her back. [Dkt. 36 ¶ 81; Dkt. 43-3 ¶ 81]. Wallak concluded Skibitcky falsified resident records in violation of West River policy. [Dkt. 36 ¶ 82; Dkt. 43-3 ¶ 82]. She then decided to terminate Skibitcky's employment. [Dkt. 36 ¶ 83; Dkt. 43-3 ¶ 83].

Wallak emailed Remillard on March 25, 2014 about Skibitcky's employment. [Dkt. 37-24 (Mot. Summ. J. Ex. 24, 03/25/14 Wallak Email)]. In the email, Wallak recounted the aforementioned disciplinary issues and the March 2014 incidents. Wallak stated: "Recommendation is termination for falsification." *Id.* On March 26, 2014, Remillard asked her to call him to discuss and requested she send additional documents. *Id.*

That same day, Wallak sent Skibitcky a letter notifying her of employment termination. [Dkt. 36 ¶ 85; Dkt. 43-3 ¶ 85]. In the letter she stated, "The reason for this termination is your inappropriate and/or unprofessional conduct including, but

not necessarily limited to, your falsification of residents records." [Dkt. 37-31 (Mot. Summ. J. Ex. 31, Termination Letter)]. Skibitcky disagrees with Wallak's decision to terminate her employment, and instead believes she should be "retrained" or "rehabilitated." [Dkt. 36 ¶ 87; Dkt. 43-3 ¶ 87].

Skibitcky testified that during her employment she complained to Wallak about Mihalchick modifying her schedule about a month before her termination, and that she felt "bullied." [Dkt. 36 ¶ 88; Dkt. 43-3 ¶ 88]. She recalls explicitly stating Mihalchick "wasn't well-liked in the facility." [Dkt. 36 ¶ 89; Dkt. 43-3 ¶ 89]. Skibitcky also contends that Mihalchick also falsified records, although Skibitcky did not report this fact. [Dkt. 36 ¶ 91; Dkt. 43-3 ¶ 91].

## Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd*

*Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) (citing *Gottlieb*, 84 F.3d at 518); *see Martinez v. Conn. State Library*, 817 F.Supp.2d 28, 37 (D. Conn. 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

<u>Analysis</u>

The FMLA provides an "eligible employee" with the right to take twelve weeks of unpaid leave for, *inter alia*, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA prohibits employers from interfering with this right and from retaliating against an employee who asserts this right. 29 U.S.C.

§ 2615. Interference and retaliation claims are two distinct claims for relief. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

Although Skibitcky initially raised both interference and retaliation claims, she only now challenges retaliation. The basis for her retaliation claim is that she requested intermittent FMLA leave in August 2013 for high blood pressure and anxiety, "notif[ied] [Healthbridge] of another intermittent medical leave" in October 2013, participated in group treatment sessions in November 2013, and then was terminated in March 2014. [Dkt. 43-2 (Opp'n Mot. Summ. J.) at 5-6]. Healthbridge argues instead that her employment was terminated because she falsified documents. [Dkt. 35 (Mot. Summ. J.) at 15-16]. Healthbridge also argues that it is not her employer and cannot be held liable under the FMLA. *Id.* at 20-21.

FMLA retaliation claims have been analyzed under the *McDonnell-Douglas* test, but the proper legal standard has not been resolved. *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 n.7 (2d Cir. 2016). The Court applies *McDonnell-Douglas* because Plaintiff does not argue for the application of the test articulated in *Bachelder v. America West Airlines, Inc.,* 259 F.3d 1112, 1125 (9th Cir. 2001); [Dkt. 43-2 at 5 (applying *McDonnell-Douglas* standard)].

I. *Prima Facie* Case

Under the *McDonnell-Douglas* standard, the plaintiff must first demonstrate a *prima facie* claim, which requires proof of the following elements: "1) [she] exercised rights protected under the FMLA; 2) [she] was qualified for [her] position; 3) [she] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory

intent." *Potenza*, 365 F.3d at 168.  Healthbridge challenges only the fourth element.

Skibitcky was terminated seven months after initially requesting leave and four months after completing her most recent leave.  As a general matter, a plaintiff may rely on temporal proximity between the exercise of FMLA rights and the alleged retaliation to establish "an inference of retaliatory intent."  *See Donnelly v. Greenburgh Cen. School Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (finding a "'very close' temporal proximity" is a sufficient basis to create a "causal connection" between the protected activity and adverse action, constituting retaliatory intent); *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 20 (D. Conn. 2016) (acknowledging that a temporal proximity of one month was sufficient to satisfy the *prima facie* elements); *Blackett v. Whole Foods Market Grp., Inc.*, No. 14-cv-1896 (JAM), 2017 WL 1138126, at *9 (D. Conn. Mar. 27, 2017) ("The temporal proximity between the time when plaintiff took his leave and his termination provides a sufficient basis for plaintiff to meet his 'minimal burden' of establishing this prong.").  "[T]here is no 'bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between a protected activity and an alleged retaliatory action.'"  *Gonzalez v. Carestream Health, Inc.*, 520 F. App'x 8, 10-11 (2d Cir. 2013) (in an FMLA case, citing *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012)); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (setting forth same rule in a First Amendment retaliation claim under 28 U.S.C. § 1983).  A court may therefore "exercise its judgment about permissible inferences that can be drawn from temporal proximity in the context of particular cases."  *Espinal*, 558 F.3d at 129

(finding the passage of six months between dismissal of a lawsuit and alleged retaliatory beatings to be sufficient to infer a causal connection); *see Summa v. Hofstra Univ.*, 708 F.3d 115, 128-29 (2d Cir. 2013) (finding seven months to be a temporal range sufficient to raise an inference of causation in a Title VII and IX case). *But see Barletta v. Life Quality Motor Sales Inc.*, No. 13-CV-02480 (DLI) (ST), slip op. at 5 (E.D.N.Y. Sept. 12, 2016) ("While close temporal proximity can give rise to an inference of retaliation, the nearly four-month gap between Plaintiff's FMLA leave and his termination is insufficient."); *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 538 (S.D.N.Y. 2008) (finding that "a three-month gap between the expiration of an employee's FMLA leave and termination is likely to be insufficient to give rise to an inference of retaliation"); *Pellegrino v. Cty. of Orange*, 313 F. Supp. 2d 303, 317 (S.D.N.Y. 2004) ("A four month temporal gap between knowledge of pregnancy and adverse employment action is considered quite weak temporal correlation in this Circuit.").

In exercising its prerogative to evaluate the temporal proximity on a case-by-case basis, courts within this Circuit evaluate all of the facts and circumstances and have held that an inference of causation may be defeated if "there was an intervening causal event. . . ." *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); *see Villagomez v. Catholic Charities, Inc.*, No. 3:09 CV 1001 (JGM), 2010 WL 4929264, at *8 n.18 (D. Conn. Nov. 30, 2010) (applying *Yarde* rule to an FMLA case). In assessing the facts of this case, the Court finds that the combination of a temporal proximity on the outer range of that which has been deemed pivotal in this Circuit and the gravity of the intervening disciplinary actions

instituted against Skibitcky in January and March of 2014, reflecting her lack of professionalism, dedication, and diligence militate against a finding that Skibitcky has established an inference of retaliatory intent.

## II.   Legitimate, Non-Discriminatory Reason

Assuming, *arguendo*, that Skibitcky demonstrated a *prima facie* case, Healthbridge would then have to "demonstrate a legitimate, non-discriminatory reason for its actions. . . ." *Graziadio*, 817 F.3d at 429. Here, Healthbridge has provided ample evidence of a legitimate reason for terminating her employment.

Skibitcky received multiple disciplinary actions for a variety of topics: failure to timely complete projects, insubordination, and arguing with a coworker.  In March 2014 she submitted multiple reports containing false information, the discovery of which prompted her *immediate* suspension and termination within two weeks.  *See* [Dkt. 37-31 (wherein the termination letter indicates "[t]he reason for this termination is your inappropriate and/or unprofessional conduct including, but not necessarily limited to, your falsification of residents records").  Poor performance, insubordination, and violations of an employer's code of conduct, are all legitimate non-discriminatory reasons to terminate employment.  *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (reversing on the grounds of sufficient pretext, but acknowledging district court held defendant had "seemingly legitimate, non-discriminatory reasons for firing [plaintiff]—primarily, poor performance reviews and affidavits from three regional managers whom [plaintiff] supervised); *Jain v. McGraw-Hill Cos., Inc.*, 506 F. App'x 47, 48 (2d Cir. 2012) (stating plaintiff's poor work performance was a legitimate, non-

discriminatory reason for terminating plaintiff's employment in an FMLA case); *Travers v. Cellco P'ship*, 579 F. App'x 409, 415-16 (6th Cir. 2014) ("This court has previously held that evidence of a violation of work rules that would have supported dismissal provides a legitimate, non-discriminatory reason."); *Kovaco v. Rockbestos-Suprenant Cable Corp.*, 979 F. Supp. 2d 252, 261 (D. Conn. 2013) (acknowledging a plaintiff's admitted misconduct as a legitimate non-discriminatory basis); *Chieppa v. William W. Backus Hosp.*, No. 3:14CV1767 (DJS), slip op. at *6 (D. Conn. Sept. 8, 2014) (stating in an age discrimination case that an employee's violation of a hospital's Code of Conduct is a legitimate, non-discriminatory reason for termination); *Edwards v. City of New York*, No. 03 Civ. 9407(PAC), 2005 WL 3466009, at *15 (S.D.N.Y. Dec. 19, 2005) ("Insubordinate and unprofessional conduct is a legitimate, non-discriminatory reason for terminating an employee."); *Forrester v. Prison Health Servs.*, No. 12 CV 363(NGG)(LB), 2015 WL 1469521, at *15 (E.D.N.Y. Jan. 5, 2015) ("Misconduct, excessive lateness, and poor performance are legitimate, non-discriminatory reasons for defendants' adverse actions."). Accordingly, Defendant has met its burden at the second stage of the *McDonnell-Douglas* test.

## III. <u>Pretext</u>

Given that there exists a legitimate, non-discriminatory reason for terminating Skibitcky's employment, Skibitcky would have to show the "proffered explanation is pretextual." *Graziadio*, 817 F.3d at 429. A reasonable juror can conclude the employer's reason for termination is "pretext for a prohibited reason" when the plaintiffs provides evidence "demonstrating weaknesses, implausibilities,

inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* at 340 (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

Skibitcky argues that she denied the falsification of documents and cites *Clarke v. 1 Emerson Drive North Operations, LLC*, No. 3:13-CV-690 (JHC), 2015 WL 3453388 (D. Conn. May 28, 2015) for the proposition that a court must deny summary judgment when a plaintiff disputes the validity of the legitimate, non-discriminatory reasons. However, *Clarke* is distinguishable from the case at hand. Clarke, an African American woman, received warnings and notices of deficient performance regarding her attendance, demeanor, adherence to policies, and compliance with physicians' orders; she participated in a meeting with human resources in April 2012 and was ultimately terminated the next month. *Id.* at *1. The district court denied defendant's motion for summary judgment with respect to the race discrimination claims because even though "[t]he weight of [the] evidence is substantial" in support of a legitimate, non-discriminatory reason, "at her deposition, Clarke disputed the validity of all, or nearly all, of the reasons given as bases for her termination." *Id.* at *3. Specifically, Clarke's opposition indicates that she disputed the facts underlying the basis for the corrective actions; for example, with respect to her interaction with a third party lab vendor she argued the investigation failed to discover and disclose relevant facts supporting her position because the defendant failed to interview another African American woman who witnessed the interaction. *See Clarke*, case number 3:13-cv-00690-

JCH, Dkt. 49 (Obj'n Mot. Summ. J.) at 10.  Such challenges raised a triable issue of fact for the jury.

Here, Skibitcky has not submitted any admissible evidence challenging the facts underlying Healthbridge's decision to terminate her employment.  The termination letter states that her termination was based on "inappropriate and/or unprofessional conduct including, but not necessarily limited to, [her] falsification of residents [sic] records."  [Dkt. 37-31].  Such language is indicative that her employment was terminated for more than just one reason, and accordingly it is insufficient for Skibitcky merely to challenge the accusation she falsified documents.

More importantly, admissible evidence supports a finding that Skibitcky admitted to the facts underlying the various disciplinary actions, including those directly preceding her employment termination.  In the first instance of June 2013, Skibitcky did not challenge her untimeliness for completing the men's group project, which resulted in a Documented Verbal Notice indicating additional violations could lead to termination.[1] [Dkt. 37-8 (wherein the notice establishes "[f]urther problems of any kind may lead to further disciplinary action up to and including termination of employment")].  Skibitcky also admitted to insubordination by challenging Mihalchick in August 2013, which led to an

---

[1] With respect to the latter disciplinary action, Skibitcky merely stated, "It's not the way it happened.  I had asked 2x previously for help - computers down so completed invites at home & get them to work before Monday."  [Dkt. 37-8].  Such a response appears to be an excuse for failing to follow the deadlines, not a challenge that she timely complied with the deadlines.

insubordination determination. [Dkt. 37-2 at 139:10-40:5]. Thereafter in December 2013 she got into an argument with her coworker, to which she admitted and received a suspension and final written warning. [Dkt. 37-2 at 156:14-57:4; Dkt. 37-15 (stating "[f]urther problems of any kind may lead to further disciplinary action up to and including termination of employment")].

Finally, Skibitcky was suspended for falsifying patients' rehabilitative therapy reports in March 2014, and she sent by fax a response wherein she did not dispute the fact she submitted incorrect information in her reports, stating the following:

> Knowing my character, you would know that I would never purposely falsify any document. I do not personally know every patient and having to look on the door to see their name. I do not personally know every patient and having [sic] to look on the door to see their name. While doing my visits first opportunity in the morning, I made contact with each patient in a room that I noted. I was told that one woman was with her aide and found out when I returned days later that she had been in the hospital. I also overheard another woman I had visited with tell a fellow patient that she was being discharged. Ironically the patients I had supposedly not visited were all in one hallway. I wonder what time they were discharged and if the names on the door were accurate. I apologize greatly for any inconvenience this may have caused.

[Dkt. 37-22]. While she does dispute she knew the information was false, the Court notes that the submission of an inaccurate report is nonetheless a violation of the Code of Conduct that may be subject to "serious disciplinary action up to and including termination." [Dkt. 36 ¶ 3; Dkt. 43-3 ¶ 3].

In addition, Skibitcky does not raise a genuine issue of material fact concerning the falsity of the patient care records she created. Such facts must be presented by affidavit of other admissible evidence *Welch–Rubin v. Sandals Corp.,* 2004 WL 2472280, at *1 n.4; *see Martinez*, 817 F.Supp.2d at 37. A party seeking to

defeat summary judgment cannot rely solely upon the allegations in the pleadings, or conclusory allegations or unsubstantiated speculation to defeat summary judgment; speculation alone is insufficient to defeat a motion for summary judgment. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011); *Gottlieb*, 84 F.3d at 518. Skibitcky does not deny that the rehabilitative therapy records she created are inaccurate. She merely postulates reasons why they were inaccurate. Whether she created false rehabilitative therapy because she was inattentive to and impersonal with her patients or deceitful is of no consequence. Healthbridge's Code of Conduct required Skibitcky to create accurate patient care records to maintain its integrity and financial viability and she failed to exercise the degree of care necessary to perform her critical function.

Finally, Skibitcky's falsified documents followed previous disciplinary actions and warning that continued misconduct could lead to her termination. Skibitcky has not presented any evidence that demonstrates the numerous legitimate, non-discriminatory reasons for terminating her employment were pretext for a prohibited reason.[2] Indeed, her employer approved her FMLA requests, the last of which she completed four months prior to the incident. Defendant rightly points out that purely temporal proximity, to the extent one

---

[2] To the extent Skibitcky's termination letter did not reference her failure to return Defendant's phone call, the Court does not agree with Plaintiff that the omission in the termination letter creates a triable issue of fact as to a legitimate reason for Healthbridge terminating her employment. Skibitcky does not point to any company policy requiring the employer to specifically state every single reason affecting the employment decision. Defendants have identified plenty of legitimate, non-discriminatory reasons to terminate her employment other than her failure to return a phone call.

existed here, is insufficient at the pretext stage.  *See* [Dkt. 45 at 4-5 (citing cases)];

*Percoco v. Lowe's Home Ctrs., LLC*, 208 F. Supp. 3d 437, 449 (D. Conn. 2016).

IV.    <u>Additional Issues</u>

The Court now addresses the dispute as to whether Healthbridge is liable as a

joint employer.  Although the parties did not identify this fact, the Court notes that

Healthbridge may have controlled Skibitcky's employment termination, because

Wallak emailed Healthbridge Regional Human Resources Director the day before

Skibitcky's termination stating, "Recommendation is termination for falsification."

[Dkt. 37-24].  This *recommendation* suggests that West River could not have

terminated her employment without Healthbridge's approval.  Nonetheless, to the

extent Healthbridge argues it was not Skibitcky's employer under the FMLA, the

Court finds this issue moot as Skibitcky cannot survive on the merits of the case.

The Court also finds that Skibitcky's Motion for Leave to Amend, which seeks

to add West River as a Defendant, is without merit.  Leave to amend is to be given

freely "when justice so requires," Fed. R. Civ. P. 15(a), unless the moving party

acted with "undue delay, bad faith or dilatory motive . . . , repeated failure to cure

deficiencies by amendments previously allowed," or the amendment would create

undue prejudice to the opposing party or be futile.  *Foman v. Davis*, 371 U.S. 178,

182 (1962).  However, "where the proposed amendment seeks to add new parties,

Fed. R. Civ. P. 21 governs."  *Jones v. Smith*, No. 9:09-cv-1058 (GLS/ATB), 2015 WL

5750136, at *25 (N.D.N.Y. Sept. 30, 2015); *see* Fed. R. Civ. P. 21 ("On motion or on

its own, the court may at any time, on just term, add . . . a party.").  Such a

distinction is a mere technicality as "the same standard of liberality applies under

either Rule." *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 96-97 (S.D.N.Y. 2010); *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 249 n.4 (D. Conn. 2014) (same); *Brown v. Tuttle*, No. 3:13 CV 1444 (JBA), 2014 WL 3738066, at *2 n.5 (D. Conn. July 30, 2014) (same in a prisoner's civil rights case). When there exists a scheduling order, the lenient standard of Rule 15(a) "must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" *Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003); *Velez v. Burge*, 483 F. App'x 626, 628 (2d Cir. 2012).

Leave to amend is futile here because Skibitcky would not be able to assert a viable claim against West River. Defendant has correctly identified that the two-year statute of limitations under 29 U.S.C. § 2617(c)(1) precludes an action against West River, given Skibitcky received notice of her termination on April 1, 2014, and did not seek to add West River until June 5, 2017. *See Doe v. Whidden*, 557 F. App'x 71, 73-74 (2d Cir. 2014) (upholding denial of leave to amend as futile where claim was time-barred by statute of limitations). "Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities." *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995). While a party may be added under Rule 15(c) under circumstances of a mistake, "the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Id.* Healthbridge filed its Answer to the Complaint on March 7, 2016, denying that it was an employer under the FMLA within the statute of limitations period. Skibitcky has herself admitted that she

considered West River her employer.  [Dkt. 37-2 at 35:8-10 (confirming she believed West River was her employer).  Skibitcky however did not seek leave to amend after the Answer was filed and before the statute of limitations ran on April 1, 2016.  The Court also notes 29 U.S.C. § 2617(c)(2) provides a three-year statute of limitations for a willful violation of § 2615.  This period also expired, on April 1, 2017.  Skibitcky did not address the statute of limitations issue in its Motion for Leave to Amend and has not replied to Healthbridge's statute of limitations argument, which indicates that she does not dispute this contention.  Therefore, leave to amend is DENIED.

## Conclusion

For the aforementioned reasons, the Court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's Motion for Leave to Amend.  Because Skibitcky's claim fails, the Court need not address damages.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 18, 2017